IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

KENNETH LOWE            )
                        )
v.                      )         2:08-0073
                        )         Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION )

To:   The Honorable John T. Nixon, Senior Judge

### REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration"), through its Commissioner, denying plaintiff's application for disability insurance benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"). The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 16), to which defendant has responded with its own motion for judgment on the administrative record (Docket Entry No. 20).[1] Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 14),[2] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be DENIED, that defendant's motion for judgment be GRANTED, and that the decision of the SSA be

---

[1] For purposes of future filings, defendant is reminded that the undersigned's scheduling order in these cases (Docket Entry No. 17) directs the filing of *a brief in response* to plaintiff's motion, not the government's own cross-motion for judgment.

[2] Referenced hereinafter by page number(s) following the abbreviation "Tr."

1

AFFIRMED.

## I.  Introduction

Plaintiff filed his DIB application on December 6, 2004, alleging the onset of disability as of March 15, 2001, due to epileptic seizures (Tr. 74, 76).  The application was denied by the state agency at both the initial and reconsideration stages of review (Tr. 56-58, 62-64).  Plaintiff thereafter requested and received a *de novo* hearing of his claim by an Administrative Law Judge ("ALJ").  The ALJ heard the case on November 15, 2007, when testimony was received from plaintiff, his mother, and an impartial vocational expert (Tr. 289-307); plaintiff was represented by counsel at the hearing.  At the conclusion of the hearing, the ALJ closed the record and took the matter under advisement, until December 28, 2007, when he issued a written decision finding that plaintiff was not disabled under the Act (Tr. 12-19).  That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through March 30, 2003.

2. The claimant has not engaged in substantial gainful activity since March 15, 2001, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3. The claimant has the following severe impairments:  epilepsy and obesity (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of light work.

He must avoid hazards and could stand/walk at [most] 2 hours per day.[3]

6. The claimant has no past relevant work (20 CFR 404.1565).

7. The claimant was born on March 11, 1981 and was 20 years old, which is defined as a younger individual age 18-49, on the alleged onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 15, 2001 through June 30, 2003, the date last insured. (20 CFR 404.1520(g)).

(Tr. 14, 16, 18, 19)

On May 30, 2008, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 4-7), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

---

[3] This finding is reported in the ALJ's decision as reflecting the ability to "stand/walk at *least* 2 hours per day." (Tr. 18)(emphasis supplied) However, the ALJ made it clear in his examination of the vocational expert at the hearing that he did not "think [plaintiff] can be on his feet more than two hours per day because of the obesity." (Tr. 305)

## II. Review of the Record[4]

At the time of his alleged onset date of March 15, 2001, Plaintiff, born on March 11, 1981, was 20 years old (Tr. 74).[5] Plaintiff has a high school education (Tr. 79). Plaintiff formerly worked for Walmart stocking groceries (Tr. 84), but he never earned a salary at or above substantial gainful activity ("SGA") levels, so such work is not considered "past relevant work" under the regulations. See 20 C.F.R. §§ 404.1560(b), 404.1565(a). In his original application for benefits, Plaintiff claims that he could no longer work as of March 2001, because he became disabled due to his seizure disorder (Tr. 76).

### A. Medical Evidence

#### 1. Pre-Onset Date Medical Evidence

Plaintiff has a history of seizures when he is not compliant with his seizure medications. In October 1992, when he was 11 years old, Plaintiff first experienced seizures and had an abnormal EEG because of those seizures (Tr. 205). Prior to being prescribed Tegretol, Plaintiff underwent different treatments for his childhood epilepsy with varying results.

Several years before taking Tegretol, Plaintiff reported having two-to-three seizures per month with migraines in October 1992 (Tr. 169-72, 174). Plaintiff was prescribed Dilantin, and, by March 1993 he played team sports and weighed 158 pounds (Tr.

---

[4] The following record review is taken from defendant's brief (Docket Entry No. 21 at 2-10), with some minor modification by the undersigned. The summary of evidence offered in plaintiff's brief is sorely lacking.

[5] At the time of his date last insured, Plaintiff was 22 years old, and at the hearing on November 15, 2007, he was 26 years old. At all times relevant to this case, therefore, he is classified as a younger individual under the Agency's regulations, which generally has no serious effect on an individual's ability to work. See 20 C.F.R. § 404.1563(c).

168). In August 1993, Plaintiff had a seizure after not taking his Dilantin (Tr. 167).

More than two years later, Plaintiff injured his arm playing sports, but he had a normal range of motion in his joints and normal x-ray findings (Tr. 165, 197). He was again injured while playing sports and had normal x-rays in April 1996 (Tr. 164-65, 193-94). In August 1996, Dr. Joseph Payant, M.D., saw Plaintiff in the emergency room upon Plaintiff's complaint of abdominal pain, and noted that Plaintiff was "slightly obese," claimed to have a history of migraines, had full range of motion in his joints, was normal neurologically, and had no joint swelling or deformities; an abdominal x-ray returned normal. (Tr. 161-63, 192)

On October 27, 1996, Plaintiff had his first seizure in more than a year, but a CT scan revealed no abnormalities, and he was in no acute distress (Tr. 159-60, 191). Shortly after this seizure, on November 1, 1996, Plaintiff had low Dilantin levels (Tr. 152). In December 1996, Daniel H. Donovan, M.D., noted that Plaintiff was markedly overweight and had infrequent seizures with no loss of school performance while on Dilantin (Tr. 158). Dr. Donovan also noted that it was difficult for Plaintiff to maintain his Dilantin levels (Tr. 158). A short time later, on January 13, 1997, Plaintiff had no musculoskeletal problems, weighed 260 pounds at the age of 15, and had full range of motion in his joints (Tr. 154-57).

By March 21, 1997, Dr. Donovan noted that Plaintiff had not had a seizure in 1.5 years,[6] and he had no recent headaches, no apnea, and had stopped his medications (Tr. 153). In April 1997, however, Plaintiff had a seizure after stopping Dilantin (Tr. 152). Mark

---

[6]This time period conflicts with the October 27, 1996 emergency room report from Fentress County General Hospital, which indicated that Plaintiff had a "generalized tonic clonic seizure" on October 27, 1996 (Tr. 153, 159).

5

A. Clapp, M.D., switched Plaintiff to Tegretol, and, within one month (May 1997), his seizures were controlled (Tr. 152, 238). Plaintiff's records do not reflect any seizure activity in 1998, and Plaintiff had a normal abdominal x-ray on April 15, 1998 (Tr. 190). He injured his head playing basketball in October 1998, which resulted in headaches (Tr. 152, 189).

In March 1999, Plaintiff had seizures as a result of being noncompliant with his Tegretol medication (Tr. 146, 232, 233-34). However, once he started the medication, he was alert, oriented, neurologically intact, and his Tegretol levels were normal by April 1999. Id. Dr. Clapp referred Plaintiff to neurologist Jacqueline Sue Crawford, M.D., who examined Plaintiff on September 1, 1999 and recorded Plaintiff's report that he weighed 300 pounds, had no problems with his medications, and experienced smaller seizures once every 2-3 months. (Tr. 148-49) Dr. Crawford's examination revealed that Plaintiff was in no acute distress, had normal strength, and had a normal gait. Id.

On November 10, 1999, Dr. Clapp noted that when Plaintiff had good Tegretol levels, he experienced no seizures; he also observed that Plaintiff had a normal gait, and normal muscle strength (Tr. 147). Nearly one year later, on October 27, 2000, Dr. Clapp again noted that Plaintiff had no seizures when compliant with his Tegretol medication, and that he often seized when he stopped taking Tegretol (Tr. 146).

On January 4, 2001, Plaintiff complained of right arm pain due to a strain, but his wrist, arm, and hand strength were normal; he was noted to be obese. (Tr. 145) Thereafter, after missing several doses of Tegretol, Plaintiff had his first seizure in 3-4 months on January 20, 2001; otherwise, Plaintiff had no complaints or other problems and a normal gait at that time (Tr. 143-44, 229).

## 2. Medical Evidence Between Alleged Onset Date and Date Last Insured

Plaintiff alleges a March 15, 2001 disability onset date (Tr. 74). Plaintiff's first seizure after that date occurred one week before March 29, 2001, and was the first seizure he had had in 3-4 months (Tr. 143). This last seizure caused a muscle strain in his leg and/or hernia, which made bearing weight difficult (Tr. 143). W. Roger Gailmard, M.D., noted that Plaintiff, who weighed 304 pounds, was fairly well-controlled on Tegretol, and noted that Plaintiff reported an average of 4-6 seizures per year (Tr. 143). Dr. Gailmard noted that Plaintiff should avoid heavy lifting, and that his Tegretol levels were good (Tr. 143, 227-28).

Plaintiff had some problems with carpal tunnel syndrome ("CTS") in 2001. On April 16, 2001, he complained of joint pain in his arms, knees, and hand, with the worst pain in his right hand (Tr. 142). He alleged that the pain disrupted his sleep, but he had good grip strength (Tr. 142). One week later, Plaintiff complained of CTS pain despite good grip strength, and Dr. Clapp stated that he should be off work for two weeks because of the CTS (Tr. 141). Testing revealed mild median nerve compromise, but all wrist muscles demonstrated normal insertional and spontaneous activity (Tr. 187-88). In May through August 2001, Plaintiff complained of pain in his shoulder, hand, and wrist (Tr. 135-36, 141, 221). By February 18, 2002, however, Plaintiff was doing well after successful bilateral carpal tunnel release surgery (Tr. 132). The record does not reflect, and Plaintiff did not testify, that he had any further problems concerning his CTS.

In early May 2001, Plaintiff, after not being compliant with his Tegretol medication, had two seizures (Tr. 122-26, 139-40, 219). Indeed, Dr. Gailmard specifically noted that Plaintiff had a history of noncompliance with medical treatment of seizures (Tr. 122). Upon examination, Plaintiff was not in distress, was alert, had a normal range of

7

motion in his extremities, had some tenderness in his knees, and had a normal gait, with no motor, sensory, or reflex deficits (Tr. 123-26, 139-40). Dr. Gailmard noted that Plaintiff had "no limitation in [his] range of motion," "[n]o swelling in the joints," and "[n]o deformities." (Tr. 125). His Tegretol level was 0.87 mcg/mL – well below the normal range of 4-10 mcg/mL (Tr. 139, 219). Plaintiff's Tegretol levels returned to normal after taking his medication, so that he was doing "very well" and ambulating without difficulty by May 10, 2001 (Tr. 123).

Nearly one year later, on February 18, 2002, Plaintiff complained to Dr. Clapp of a headache, which Dr. Clapp noted to be "of migrainous nature." (Tr. 132) Dr. Clapp also noted normal results on his physical and neurological examination of Plaintiff (Tr. 132, 218). On March 27, 2002, Dr. Clapp noted that Plaintiff, a "pretty obese guy," had low back pain, was alert, recently started work but wore himself out, and should initially work 4-6 hour shifts. He had a normal chest x-ray, a clear upper airway, normal blood work, and no other abnormal findings (Tr. 132, 204, 216). A little more than two weeks later, on April 14, 2002, Plaintiff had his first seizure in more than a year (Tr. 132). On May 3, 2002, Plaintiff had a "subtherapeutic level of Tegretol" and otherwise normal blood work (Tr. 131, 213). The records reflect that Plaintiff was not seen again for his seizure disorder until after March 30, 2003, his date last insured.

### 3. Medical Evidence After Plaintiff's Date Last Insured[7]

On November 19, 2003, Dr. Clapp treated Plaintiff for a cold, a tick bite, and diarrhea (Tr. 130). At that time, Plaintiff's blood work was normal, his Tegretol level was low due to a few missed doses, he was having tension headaches, and a cervical spine radiograph revealed likely early degenerative disc disease with no definitive acute osseous abnormality (Tr. 130, 203, 212). Plaintiff had a normal head CT scan on January 7, 2004 (Tr. 202).

The record reflects that Plaintiff did not have another seizure until July 22, 2004, more than seven months after his last alleged seizure (of which there is no record in the transcript) and more than 15 months after his DLI (Tr. 130). While he again alleged headaches believed to be stress related, and obesity of more than 300 pounds, Plaintiff had a normal physical exam (Tr. 130). Later in October 2004, Dr. Gilbert Ghearing, M.D., noted that Plaintiff's seizures were "being well controlled" with Tegretol (Tr. 130). On December 3, 2004, Dr. Ghearing noted that, other than a case of allergic rhinitis for which he was not taking any specific medications, Plaintiff was doing well (Tr. 129). On January 24, 2005, after noting Plaintiff's morbid obesity, Dr. Ghearing nevertheless encouraged Plaintiff to lose weight, diet, and look for a job more intensely (Tr. 128).

---

[7]The last date that Plaintiff was insured under the Act was March 30, 2003, thus, unless he is found to have been disabled before that date, he cannot be eligible for Title II benefits (Tr. 14). Moreover, evidence concerning a claimant's medical condition after his or her disability insured status has expired is generally irrelevant, i.e., the relevant issue is whether such claimant was disabled within the meaning of the Act on or before the date on which his insured status expired. See 42 U.S.C. §§ 423(a)(1)(A), 423(c)(1); 20 C.F.R. §§ 404.130, 404.315(a); Social Security Ruling 83-20; Moon v. Sullivan, 923 F.2d 1175, 1182 (6th Cir. 1990); Higgs v. Bowen, 880 F.2d 860, 862 (6th Cir. 1988); see also Henley v. Comm'r of Social Security, 58 F.3d 210, 213 (6th Cir. 1995) (stating that "[w]hen one loses insured status, one is simply no longer eligible for benefits for disability arising thereafter").

On May 6, 2005, Dr. Michael T. Cox, M.D., a physician consulted by the Disability Determination Section ("DDS") of the state agency, examined Plaintiff (Tr. 261-65). Although Plaintiff did not provide his old medical records to Dr. Cox, Dr. Cox thoroughly examined Plaintiff (Tr. 261). Plaintiff alleged that he was having one seizure per month (12 in last year); was compliant with medication; was slowed down by his obesity; and, was having headaches two times per week (Tr. 261-63). Dr. Cox found that Plaintiff was not in acute distress, was morbidly obese (400+ lbs.), was able to ambulate without any device, had a normal heart rate, was alert and oriented, had no motor and sensory deficits, was able to stand on either foot (both on his toes and on his heels), had normal joints, had a normal range of motion in his extremities, could lift 30 pounds occasionally and 10 pounds frequently, should avoid working with hazards and heights, should not drive, and could sit and stand without restriction (Tr. 261-65).

On June 16, 2005, Michael N. Ryan, M.D., a state agency physician, performed a non-examining medical review and assessment of Plaintiff (Tr. 266-73). In it, he found that Plaintiff had no exertional limitations, minimal postural limitations (frequent climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling, and occasional climbing of ladders/ropes/scaffolds), no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations (other than avoiding hazards because of his seizures) (Tr. 266-72).

Plaintiff alleges that his symptoms worsened in June 2005 (Tr. 105). As of July 21, 2005, the record shows that Plaintiff had not had a seizure in approximately one year (Tr. 112). Plaintiff stated that his pain again worsened in August 2005 (Tr. 114). However, other records show that Plaintiff had indicated previously that his impairments caused him no

10

pain, that he could take care of his personal needs, and that he did not have any symptoms other than ones stemming from his seizures (Tr. 76, 107).

The record indicates that Plaintiff did not have any seizures in 2006. More than four and one half years after his insured status expired, Plaintiff submitted a printout from a website indicating that, as of November 1, 2007, he had a BMI of 61 (Tr. 121). One month after that, Dr. Clapp noted that Plaintiff had a seizure the previous week resulting in back and knee pain (Tr. 278-83). Dr. Clapp also noted that Plaintiff, among other things, was able to walk; denied pain in all other areas; had a normal blood pressure (118/68); was not in acute distress; and was able to bear his weight (Tr. 278-83).

B. <u>Vocational Evidence</u>

The ALJ posed a hypothetical question to an impartial vocational expert ("VE"), Anne Thomas, asking whether jobs existed in the national economy for a person with the same age (26 years old as of the hearing and 20 years old as of the DLI), education (high school education), past work experience (no past relevant work), and height and weight (six feet tall and 450 pounds) as Plaintiff, and who was limited to a range of work at the light exertional level, including lifting no more than 20 pounds occasionally and ten pounds frequently, walking or standing for, at most, two hours per day, and avoiding hazards (Tr. 304-05). The hypothetical assumed that the individual has headaches that accompany or follow any seizure activity (Tr. 306).

In response to that question, the VE stated that jobs would be available at the unskilled, sedentary level of work for such a person, including approximately 2,200 "small products assembler" jobs in Tennessee (156,000 nationally), approximately 600 "small products inspector" jobs in Tennessee (42,000 nationally), and approximately 1,900

11

"production laborer" jobs in Tennessee (70,000 nationally) (Tr. 305). The VE added that such jobs would require that the employee not be absent more than two times per month (Tr. 305). She also stated that her testimony was consistent with the Dictionary of Occupational Titles (Tr. 305).

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

#### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must

12

"result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also

Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990).  In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony.  See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C. Plaintiff's Statement of Errors

Plaintiff's primary contention in this case is that the ALJ erred in failing to give appropriate consideration to plaintiff's obesity, in keeping with the requirements of Social Security Ruling ("SSR") 02-1p, 2000 WL 628049 (S.S.A. Sept. 12, 2002).  Plaintiff further includes bare allegations that the ALJ failed to evaluate plaintiff's headaches or the side effects of his seizure medication.  As explained below, the undersigned finds no merit in these contentions.

Plaintiff claims that "[n]owhere in the decision does the ALJ address the effects of the claimant's super morbid obesity despite being supplied documentation that the

claimant has a BMI [(body mass index)] of 61." (Docket Entry No. 17 at 3)[8]  He further argues that the consequences of obesity highlighted in SSR 02-1p, including, *inter alia*, its effect on the ability to sustain weight-bearing functions, were not given appropriate consideration in light of the medical evidence showing difficulty with weight-bearing and plaintiff's general discomfort.  (Tr. 143)

        With all due respect, the undersigned can conceive of no defect in the evaluation of plaintiff's obesity, vis-à-vis SSR 02-1p or otherwise, given the ALJ's findings that the condition was not only a medically severe impairment, but one with <u>considerable</u> functional effects, *i.e.*, limiting plaintiff to work at the light exertional level which only requires standing or walking for up to two hours.  It is particularly apparent that a thorough evaluation of plaintiff's obesity was made when considering that, as defendant points out, the period at issue here is March 2001 to June 2003, when plaintiff's weight (and presumably his BMI) does not appear to have approached the extremes identified thereafter.  As documented during this period of plaintiff's insured status, his weight fluctuated around the 300-pound mark (Tr. 139, 178, 187), not the 400-plus pound range where his weight had settled by the time he filed his DIB claim in December 2004 (Tr. 75).  Nonetheless, in determining plaintiff's exertional limitations on account of his morbid obesity, the ALJ made findings more favorable to plaintiff than did the consultative examiner, Dr. Cox, who opined in May 2005 that plaintiff could stand without restriction despite his weight of greater than 400 pounds, and to whom the ALJ gave "great weight."  (Tr. 18, 263)  To the extent that plaintiff is arguing that his level of obesity, then or now, is presumptively disabling under SSR 02-1p

---

[8]This BMI, reflecting Level III "extreme" obesity, is calculated based on plaintiff's height of six feet, and his reported weight of 450 pounds the month prior to his hearing.  (Tr. 121)

15

and the Listing of Impairments, the ruling makes clear that such a determination would only be proper in a case where the record documents functional effects of the obesity (e.g., an inability to ambulate effectively) that equal in severity the particular requirements of a listed impairment to the affected body system. 2000 WL 628049, at *5-6. This is simply not such a case. No medical source offered any opinion -- much less identified any objective proof -- that plaintiff was more severely limited by his obesity than determined by the ALJ. Accordingly, the undersigned finds the ALJ's determinations with respect to plaintiff's obesity to be consistent with the requirements of SSR 02-1p and amply supported by the evidence.

Finally, as stated in defendant's brief, the ALJ was presented with testimony establishing that plaintiff's more severe headaches were precipitated by his seizures (Tr. 303), and thus appears to have duly considered these headaches in the scope of his analysis of plaintiff's seizures (Tr. 17, 306) and the extent to which they are capable of being controlled by full compliance with medical treatment (Tr. 18). Moreover, the testimony of both plaintiff and his mother confirms that his medication side effect of increased sleepiness coincided with the last increase in plaintiff's Tegretol dosage, to three tablets three times a day (Tr. 298-99); that dosage increase appears from the record to have been ordered on July 22, 2004 (Tr. 130), more than a year after plaintiff's date last insured for DIB. Based upon this and other substantial evidence supporting the findings and decision of the ALJ that plaintiff was capable of performing the significant number of sedentary jobs identified by the vocational expert, the undersigned concludes that the decision of the ALJ must be affirmed.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED, that defendant's motion for judgment on the administrative record be GRANTED, and that the decision of the SSA be AFFIRMED.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

ENTERED this 30th day of July, 2009.

s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE